# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 22, 2024      Decided August 22, 2025

No. 23-5310

BATTLE CREEK HEALTH SYSTEM, ET AL.,
APPELLEES

v.

ROBERT F. KENNEDY, JR., SECRETARY OF THE UNITED STATES,
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00545)

---

*Kevin J. Kennedy*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Matthew M.* Graves, U.S. Attorney, Abby *C. Wright*, Attorney, *Samuel R. Bagenstos*, General Counsel, U.S. Department of Health and Human Services, *Janice L. Hoffman*, Associate General Counsel, *Susan Maxson Lyons*, Deputy Associate General Counsel, and *James F. Segroves*, Attorney.

*Andrew B. Howk* argued the cause for appellees. With him on the brief was *Heather D. Mogden*.

*Jonathan C. Bond* and *Robert A. Batista* were on the brief for *amici curiae* American Hospital Association, et al. in support of appellees.

*Mark D. Polston*, *Christopher P. Kenny*, and *Nikesh Jindal* were on the brief for *amici curiae* Florida Hospital Association, et al. in support of appellees.

Before: SRINIVASAN, *Chief Judge*, WALKER, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  The Medicare program reimburses hospitals for providing services to covered patients. Hospitals that treat a disproportionate number of low-income patients are eligible to receive an upward adjustment to offset the increased treatment costs.  That adjustment is known as the disproportionate share hospital (or DSH) adjustment.

In this case, a group of hospitals seeks to contest the way in which one component of the DSH adjustment was determined for fiscal year 2007.  We have no occasion to engage with the merits of their challenge.  The administrative body that hears such challenges, the Provider Reimbursement Review Board, dismissed the hospitals' claim in this case on the ground that it was brought too early.  According to the Board, the hospitals needed to wait until they knew the final amount of their DSH adjustment rather than just the determination of one component of it.  The district court disagreed and concluded that the hospitals' challenge could go forward.  Because we agree with the Board, we reverse the district court.

3

I.

A.

Medicare "provides health insurance to Americans who are 65 or older, as well as to disabled Americans." *Allina Health Servs. v. Price*, 863 F.3d 937, 938 (D.C. Cir. 2017) (*Allina II*); 42 U.S.C. § 1395 *et seq*. The program is administered by the Centers for Medicare and Medicaid Services (CMS) within the Department of Health and Human Services.

1. Medicare Part A provides eligible individuals with "government-administered health insurance." *Allina II*, 863 F.3d at 938. Under Part A, the government pays hospitals directly for services rendered to covered patients. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) (*Allina III*). Part C, meanwhile, covers individuals who enroll in private rather than government-administered health insurance plans, and the government pays the insurance premiums rather than the hospitals directly for care. *See id.*; 42 U.S.C. §§ 1395w-21–29; *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2–3 (D.C. Cir. 2011).

Before 1983, Medicare reimbursed hospitals for the "reasonable costs" they incurred to furnish care to covered patients. *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1226–27 (D.C. Cir. 1994). Because reimbursements depended on a hospital's actual costs (subject to reasonableness limitations), the final determination of the reimbursement amount owed to a hospital was made after the end of the fiscal year, based on the hospital's year-end cost report. *See Washington Hosp. Ctr. v. Bowen*, 795 F.2d 139, 141 (D.C. Cir. 1986). A document called the "Notice of Program Reimbursement" (or NPR), produced after the end of

the fiscal year, contained the final determination of the total reimbursement owed to a provider. *See id.* NPRs continue to serve that function today.

In 1983, Congress "completely revised" the method for determining the reimbursement amounts. *Methodist Hosp.*, 38 F.3d at 1227; Social Security Amendments of 1983, Pub. L. No. 98-21, § 1886(d)(1)–(4) (codified as amended at 42 U.S.C. § 1395ww(d)(1)–(4)). Congress instituted the Prospective Payment System (PPS), under which reimbursements are based on prospectively determined standard rates for a given type of diagnosis rather than on a retrospective determination of a hospital's actual treatment costs. *See Washington Hosp. Ctr.*, 795 F.2d at 141–42. Under the PPS, that is, hospitals are generally reimbursed at "a fixed rate for treating each Medicare patient . . . based on the patient's diagnosis and regardless of the hospital's actual costs." *Becerra v. Empire Health Found. for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 429 (2022). The standard reimbursement rates are generally known as the "federal rates." *See* 42 C.F.R. § 412.64. And because the federal rates are fixed prospectively, hospitals know in advance the reimbursement rates they will receive for services they will render in any year.

2. The Medicare statute also provides for certain adjustments to a hospital's reimbursement rates. This case involves one such adjustment: the "disproportionate share hospital" (or DSH) adjustment. 42 U.S.C. § 1395ww(d)(5)(F). The DSH adjustment compensates hospitals that "serve[] a significantly disproportionate number of low-income patients," *id.* § 1395ww(d)(5)(F)(i)(I), who "are often more expensive to treat than higher income ones, even for the same medical conditions," *Empire Health*, 597 U.S. at 429.

The amount of a hospital's DSH adjustment depends on the level of its "disproportionate patient percentage," a proxy for the extent to which the hospital serves low-income patients. 42 U.S.C. § 1395ww(d)(5)(F)(v). To be eligible for a DSH adjustment, a hospital must have a disproportionate patient percentage that exceeds 15%. *Id.* "The higher the disproportionate-patient percentage goes, the greater the rate mark-up that the hospital will receive." *Empire Health*, 597 U.S. at 432.

A hospital's disproportionate-patient percentage is the sum of two fractions, both defined by statute. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1105 (D.C. Cir. 2014) (*Allina I*). The first is the "Medicare fraction" and the second is the "Medicaid fraction." *Id.* "[A]t a high level of generality, the Medicare fraction is a measure of a hospital's senior (or disabled) low-income population, while the Medicaid fraction is a measure of a hospital's non-senior (except for disabled) low-income population." *Empire Health*, 597 U.S. at 430.

For the Medicare fraction, the "denominator is the time the hospital spent caring for patients who were 'entitled to benefits under' Medicare Part A" (calculated in patient days) and the "numerator is the time the hospital spent caring for Part-A-entitled patients who were *also* entitled to income support payments under the Social Security Act." *Allina III*, 587 U.S. at 571 (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)). Those income support payments are Social Security Income (SSI), which is paid to "financially needy individuals" who are over 65 or disabled. *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988).

The Medicaid fraction, meanwhile, "accounts for the number of Medicaid patients—who, by definition, are low income—*not* entitled to Medicare." *Allina I*, 746 F.3d at 1105. The numerator is the number of patient days attributable to

individuals eligible for Medicaid and not entitled to Medicare Part A, and the denominator is "the total number of the hospital's patient days." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

To calculate a hospital's disproportionate-patient percentage, CMS works with intermediaries known as Medicare Administrative Contractors—often insurance companies—who calculate a hospital's reimbursement amounts based on the hospital's year-end cost reports. Those reports contain the kind of patient-day data that feeds into the Medicare and Medicaid fractions. *See Northeast Hosp.*, 657 F.3d at 3. But the Medicare contractors and hospitals do not have all the information needed to determine a hospital's Medicare fraction because they lack access to SSI data. CMS obtains that data, considers it together with patient information from the Medicare contractors, and calculates and publishes hospitals' Medicare fractions. *See* 42 C.F.R. § 412.106(b)(2). After CMS publishes the Medicare fraction, the Medicare contractors compute the Medicaid fraction based on hospitals' year-end cost reports, sum up the fractions, and determine a hospital's entitlement to a DSH adjustment for the relevant year and the amount of any adjustment. *Id.* § 412.106(b)(5). Hospitals ultimately learn their final reimbursement amounts—including the final DSH adjustment amount—when they receive their NPRs.

3. Hospitals dissatisfied with their Medicare reimbursements can seek review before the Provider Reimbursement Review Board. The Board has jurisdiction in two situations of relevance here. First, the Board can address claims concerning a "final determination . . . as to the amount of total program reimbursement due the provider" as set out in the NPR. 42 U.S.C. § 1395oo(a)(1)(A)(i). Second, the Board can also resolve challenges to a "final determination" "as to the amount of the payment" due to a provider under the PPS. *Id.* §

1395oo(a)(1)(A)(ii). *See Washington Hosp. Ctr.*, 795 F.2d at 144–48. If the Board concludes it lacks jurisdiction, it issues a jurisdictional dismissal. 42 C.F.R. § 405.1840(c)(2). A hospital that receives a final decision from the Board, including a jurisdictional dismissal, may seek judicial review of the Board's decision. 42 U.S.C. § 1395oo(f)(1).

B.

In June 2009, CMS published the Medicare fractions for fiscal year 2007. In December 2009, a group of hospitals appealed the determination of their 2007 Medicare fractions to the Board. The hospitals disputed CMS's inclusion of Medicare Part C beneficiaries in the Medicare fraction instead of the Medicaid fraction. "The question is important as a practical matter because Part C enrollees . . . tend to be wealthier than patients who opt for traditional Part A coverage," such that "counting them" in the Medicare fraction "makes the fraction smaller and reduces hospitals' payments considerably." *Allina III*, 587 U.S. at 571.

The hospitals' appeal went unaddressed before the Board for more than seven years. Then, in 2017, the Board on its own motion dismissed the hospitals' challenge for lack of jurisdiction. The Board concluded that "publication of the [Medicare fractions] on the CMS website is not a final determination as contemplated by the Board's jurisdictional statute." J.A. 12 (citing 42 U.S.C. § 1395oo(a)). In relevant part, the Board reasoned that it lacked authority to review the Medicare fractions until the final determination of the hospitals' DSH adjustments for the relevant year, which had not happened at the time the appeals were brought. Until the final settled cost report for a given year, there is no determination whether a hospital is even "eligible for DSH payment at all, [or] the amount of any such final payment."

J.A. 15.  As a result, "a provider may not appeal DSH-related issues" like the Medicare fractions until they are "incorporated into settled cost reports (and associated NPRs)," at which point there will be "a final determination."  *Id.*; *see* 42 U.S.C. § 1395oo(a)(1)(A)(i)-(ii).  The Board thus dismissed the appeal, leaving the hospitals to wait to bring their challenge until the NPRs issue.

The hospitals then brought this action in the district court, contending that the Board had erred in dismissing their appeal on jurisdictional grounds.  The district court agreed with the hospitals.  The court understood our precedent—in particular, our decision in *Washington Hospital Center*, 795 F.2d 139—to support treating publication of the Medicare fraction as a "final determination" for purposes of the Board's jurisdiction, even if there has been no final settlement of a hospital's eligibility for—or the amount of—any DSH adjustments in an NPR.

## II.

The government defends the Board's conclusion that it lacked jurisdiction over the hospital's challenge because CMS's publication of the 2007 Medicare fractions was not a "final determination of the Secretary as to the amount of the payment" due to a hospital.  42 U.S.C. § 1395oo(a)(1)(A)(ii).  We agree with the government.

## A.

At the outset, we reject the hospitals' submission that we cannot consider the government's argument for sustaining the Board's decision because it diverges from the Board's own rationale.  A court of course must judge agency action based on "the grounds invoked by the agency."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  But the *Chenery* principle is

satisfied "[a]s long as the agency's path may reasonably be discerned, . . . even if it is of less than ideal clarity." *Press Commc'ns LLC v. FCC*, 875 F.3d 1117, 1122 (D.C. Cir. 2017) (internal quotation marks omitted). That standard is readily satisfied here.

The Board held that a challenge to the determination of the Medicare fraction can be brought only after the final determination of the DSH adjustment amount in an NPR—the same understanding urged by the government before us. To be sure, the Board did not specifically quote the words "as to the amount of the payment" in 42 U.S.C. § 1395oo(a)(1)(A)(ii), which the government now emphasizes in its argument. But the full statutory phrase is "final determination of the Secretary as to the amount of the payment," and the Board invoked the lead-in words of that clause—"final determination"—in explaining that the hospitals needed to wait to bring their challenge until the final settlement of the DSH adjustment amount in an NPR. *See* J.A. 12, 15. And at any rate, an "agency in this court [can] invoke[] reasoning 'not specifically discussed in the order under review'" without running afoul of the *Chenery* principle, so long as "[w]e can reasonably discern the [agency's] path in its decision." *Press Commc'ns*, 875 F.3d at 1122 (quoting *Chiquita Brands Int'l v. SEC*, 805 F.3d 289, 299 (D.C. Cir. 2015)). We can here.

## B.

The issue we face is whether CMS's publication of the Medicare fractions qualified as a "final determination . . . as to the amount of the payment" owed to hospitals under the PPS within the meaning of 42 U.S.C. § 1395oo(a)(1)(A)(ii). There is no dispute that, in the context of this case, "the amount of the payment" is the per-patient reimbursement amount due to a hospital under the PPS. *See Washington Hosp. Ctr.*, 795 F.2d

at 147. That per-patient rate, as explained, is grounded in the PPS's standard "federal rate" for the type of diagnosis. And for hospitals eligible for a DSH adjustment, the per-patient federal rate is augmented by a hospital's DSH adjustment.

1.  Importantly, the federal rate is prospectively fixed, whereas the DSH adjustment is retrospectively determined. For the federal rate, hospitals know in advance the per-patient reimbursement amount they will receive by diagnosis category: the purpose of instituting the PPS was to standardize reimbursement rates and set those rates prospectively. But the DSH adjustment to the federal rate depends on year-end information about the number of low-income patients a hospital treats in a given year. *See* pp. 5–6, *supra*. For the DSH adjustment, then, hospitals do not know the amount they will receive (if any) until they receive their NPR after the relevant year. By that time, the hospitals will have submitted their year-end cost reports and CMS will have obtained SSI information for the patients treated during the year. And based on that information, the hospitals' Medicare and Medicaid fractions will have been determined and the hospitals' eligibility for and amount of any DSH adjustments will have been settled.

The prospectivity of the federal rate, as compared with the retrospectivity of the DSH adjustment, has implications for when a hospital can properly bring an appeal to the Board. For the federal rate, once it is prospectively set, there has been "a final determination of the Secretary as to the amount of the payment" to be made to hospitals. 42 U.S.C. § 1395oo(a)(1)(A)(ii). A hospital wanting to challenge the federal rate can bring its appeal to the Board at that time. It need not wait for application of the federal rate to patients during the year or for final settlement of its total amount of reimbursements under the federal rate in the post-year-end NPR. Insofar as the hospital wishes to challenge the per-

patient federal rate itself, the "amount of [that] payment" is known once the rate is set, and nothing that happens between then and the issuance of the NPR will affect that amount. *See Washington Hosp. Ctr.*, 795 F.2d at 142 n.2 ("Under PPS the amount of payment per discharge is fixed in advance, is not based on a hospital's actual costs, and is not subject to retroactive adjustment.").

With the DSH adjustment, by contrast, a hospital's eligibility for the adjustment and the amount of the adjustment (if any), is not set until a hospital receives its NPR after the end of the year. Then, and only then, is there a "final determination of the Secretary as to the amount of the payment" to be made to the hospital. 42 U.S.C. § 1395oo(a)(1)(A)(ii).

2. Our decision in *Washington Hospital Center* is instructive in explaining when a hospital's challenge to "the amount of the payment under" the PPS can be brought to the Board. 42 U.S.C. § 1395oo(a)(1)(A)(ii). The case arose in a phase-in period before full implementation of the PPS's prospectively set, standardized rates. During that transitional period, a hospital's reimbursement amount was based on a blend of two components, one of which would become the PPS's federal rate (i.e., uniform reimbursement amounts set in advance for diagnosis categories), and other of which was a "hospital-specific rate" predicated on a given hospital's actual costs in a fixed prior year. *See Washington Hosp. Ctr.*, 795 F.2d at 142. While the hospital-specific rate was based on a hospital's actual costs, it was prospective in that it depended solely on already-incurred costs in a previous year. In other words, it, no less than the other component, was "independent

of current costs and . . . determined with finality prior to the beginning of the cost year." *Id.* at 146.

The hospitals in *Washington Hospital Center* sought to appeal the calculation of the hospital-specific rate to the Board. They brought their challenge after obtaining notice of their hospital-specific rate, but before incurring the costs to which the rate would be applied and thus before receiving a post-year-end NPR. *See id.* at 143. We considered whether there had been "a final determination . . . as to the amount of the payment under" the PPS so as to give the Board jurisdiction, 42 U.S.C. § 1395oo(a)(1)(A)(ii), or whether the hospitals instead would need to wait until they received their post-year-end NPR. We held that the Board had jurisdiction.

We explained that Congress enacted § 1395oo(a)(1)(A)(ii) in conjunction with instituting the PPS. *Id.* at 145–46. With that change, there are now two avenues of appeal to the Board. The first was already in existence when reimbursements were set retroactively based on a hospital's actually incurred costs. It enables challenges "to the amount of total program reimbursement due the provider for the items and services furnished to [covered] individuals . . . for the period covered by [the hospital's annual cost] report." 42 U.S.C. § 1395oo(a)(1)(A)(i). That preexisting avenue, because it addresses the "total program reimbursement due" for the period covered in an annual cost report, necessarily comes after settlement of that "total" in a post-year-end NPR. *Washington Hosp. Ctr.*, 795 F.2d at 146–47. The new avenue, § 1395oo(a)(1)(A)(ii), enables challenges to "per-patient" payment rates under the PPS—the rates a hospital will be paid for treating a patient by diagnosis category—which can be set before the end of a cost year. *Id.* That "provision applicable to PPS recipients" thus "cannot be read to require hospitals to file

costs reports and await NPRs prior to filing a [Board] appeal." *Id.* at 146.

On that understanding, the challenge in *Washington Hospital Center* was within the Board's jurisdiction. The hospitals, as noted, contested the calculation of the hospital-specific component of the blended transitional payment rate. The other component, the precursor to the standardized federal rate, was "final once the Secretary has published" it, "as he ha[d]." *Id.* at 148. There had also been "a final determination as to the hospital-specific amount." *Id.* And because both components of the "per-patient amount" under the PPS had been finalized, "there [was] a final determination as to the amount of payment as required by § 1395oo(a)(1)(A)(ii)." *Id.*; *see Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 811 (D.C. Cir. 2001) ("[P]re-NPR challenge could be brought where the Secretary had firmly established 'the only variable factor in the final determination as to the amount of payment.'" (quoting *Washington Hosp. Ctr.*, 795 F.2d at 147)).

3. Our rationale in *Washington Hospital Center* compels the opposite result in this case. *Washington Hospital Center*, unlike this case, did not involve a post-end-of-year adjustment to the baseline reimbursement rate. Rather, all relevant components of the per-patient PPS rate had been finalized, and there was thus no need for the hospitals to wait for an NPR to bring their challenge to the hospital-specific component pursuant to § 1395oo(a)(1)(A)(ii).

This case is different. Here, the Medicare fraction had been published and the hospitals sought to challenge its calculation. But other components of the DSH adjustment (and thus of the per-patient payment amount) had yet to be finalized. Indeed, the hospitals could not know that they would be eligible for a DSH adjustment based on the Medicare fraction

alone. The Medicaid fraction remained outstanding, and so too, therefore, did the disproportionate-patient percentage, and ultimately the hospitals' eligibility for, and amount of, any DSH adjustment. *See* pp. 5–6, 8, *supra*. Those are finally settled upon issuance of an NPR. Unlike in *Washington Hospital Center*, then, in this case there had been no "final determination of the Secretary as to the amount of the payment" under the PPS. 42 U.S.C. § 1395oo(a)(1)(A)(ii).

To be sure, *Washington Hospital Center* establishes that *some* challenges "to per-patient amounts" under the PPS can be brought pursuant to § 1395oo(a)(1)(A)(ii) before issuance of an NPR. 795 F.2d at 147. It did not establish, though, that *every* such challenge is necessarily ripe for consideration in advance of an NPR. Some hospital-specific adjustments under the PPS may be finalized prospectively and can be appealed to the Board at that time—before an NPR. An example is the "outlier adjustment" for a hospital whose "charges, adjusted to cost, exceed" an outlier threshold fixed by CMS. 42 U.S.C. § 1395ww(d)(5)(A)(ii). The per-patient amount of a hospital's outlier adjustment, like the baseline federal rate, is generally set ahead of the cost year. *See* Gov't Reply Br. 18. But for a retrospective adjustment like the DSH adjustment, a challenge must await final settlement of the per-patient amount following the cost year—i.e., after the "final determination . . . as to the amount of the payment." 42 U.S.C. § 1395oo(a)(1)(A)(ii). For both the outlier and DSH adjustments (and any other component of a hospital's per-patient reimbursement rate under the PPS), then, the issue is not *whether* the amount can be challenged—it can—but *when*.

In this regard, the fact that DSH adjustments are settled retrospectively does not make them any less a part of the PPS for purposes of falling within the Board's review under § 1395oo(a)(1)(A)(ii). That provision pertains specifically to

payments under the PPS, meaning that DSH payments must be part of that "prospective" payment system to be subject to the provision's coverage. *See* 42 U.S.C. § 1395oo(a)(1)(A)(ii) (referring to "the amount of the payment under subsection (b) or (d) of section 1395ww of this title"—i.e., the provisions applying the PPS); *Washington Hosp. Ctr.*, 795 F.2d at 144–45. DSH payments, although settled after a cost year, are part of the PPS in that they adjust the amount of the reimbursements pursuant to the prospectively set rates. That is why they (along with the federal rate) are established in a provision entitled "Inpatient hospital service payments on basis of *prospective* rates." 42 U.S.C. § 1395ww(d) (emphasis added); *see id.* § 1395ww(d)(5)(F)(i)(I) (providing for DSH adjustments).

The hospitals in this case argue that even if settling the amount of a DSH adjustment requires year-end cost information, that information is available by the time of publication of the Medicare fraction, and there was thus no need for them to await issuance of an NPR before bringing an appeal. Here, the hospitals observe, CMS published their Medicare fractions for fiscal year 2007 after receiving their year-end cost reports and obtaining SSI information about the patients they served. At that point, the hospitals contend, they could have easily: calculated the Medicaid fraction based on the same year-end cost reports, summed the two fractions to determine their disproportionate-share percentage and whether it exceeds the DSH eligibility threshold; and then multiplied that percentage by the federal rate to obtain a close estimate of their DSH adjustment amount. In that light, the hospitals urge, they could "do the math themselves" (Hospitals Br. 42) to obtain a "final determination . . . as to the amount of the

payment" before receiving their NPRs. 42 U.S.C. § 1395oo(a)(1)(A)(ii).

That argument cannot carry the day. The terms of § 1395oo(a)(1)(A)(ii) give the Secretary of Health and Human Services (or the Secretary's delegee)—not affected hospitals—responsibility for making the "final determination": the provision speaks in terms of the "final determination *of the Secretary* as to the amount of the payment under" the PPS. *Id.* (emphasis added). That does not happen until issuance of an NPR. And the Secretary's final determination can ultimately turn on interpretive issues lying within the Secretary's—not the hospitals'—purview. As the government points out (Gov't Reply Br. 12), for instance, calculating the Medicaid fraction requires the Secretary to determine which patients count as "eligible for medical assistance under a State plan." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); *see Monmouth Med. Ctr.*, 257 F.3d at 809–10 (reviewing developments in Secretary's interpretation). Additionally, the Secretary takes into account audit adjustments to the hospitals' year-end cost reports, which can affect the final settlement of payment amounts under the PPS in ways yet to surface when Medicare fractions are published.

At that time, in short, there had not been a "final determination of the Secretary as to the amount of the payment" under the PPS. 42 U.S.C. § 1395oo(a)(1)(A)(ii). The Board thus lacked jurisdiction over the hospitals' appeal, as it correctly determined.

\* \* \* \* \*

For the foregoing reasons, we reverse the judgment of the district court.

*So ordered.*